# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TERRY YOUNG,            :
:
     Plaintiff,          :
:
v.                  :       CIVIL ACTION NO.
:       1:12-CV-3623-RWS
McCARTHY-BUSH       :
CORPORATION d/b/a     :
McCARTHY IMPROVEMENT  :
COMPANY,           :
:
     Defendant.        :

## ORDER

This case comes before the Court on Defendant's Motion for Summary

Judgment [22] and Plaintiff's Motion for Leave to File Responsive Materials

out of Time [32].  After reviewing the record, the Court enters the following

Order.

## Background

Plaintiff Terry Young brought this action against his former employer,

Defendant McCarthy-Bush Corporation d/b/a McCarthy Improvement

Company, alleging discrimination and retaliation in violation of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et</u> <u>seq.</u>, the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., the Family Medical Leave

Act ("FMLA"), 28 U.S.C. § 2601 et seq., and the Rehabilitation Act, 29 U.S.C.

§ 701 et seq.  Plaintiff also alleges claims for intentional infliction of emotional

distress and breach of contract under Georgia law.

Defendant hired Plaintiff as a Concrete Paving Mechanic sometime in

June 2010, although the precise date is in dispute.  (Def.'s Statement of Material

Facts (" Def.'s SMF"), Dkt. [22-1] ¶ 1; Pl.'s Statement of Material Facts ("Pl.'s

SMF"), Dkt. [28-8] ¶ 1.)  According to Plaintiff, he was hired on June 4, 2010,

the day he received an e-mail offering him employment.  (Offer E-mail, Dkt.

[29-1] at 2.)  Defendant contends that it hired him on June 11, 2010, the first

day it says that Plaintiff performed any work.  (Def.'s SMF, Dkt. [22-1] ¶ 1;

Def.'s Br., Dkt. [22-2] at 14.)  On June 5, the day after receiving the offer of

employment, Plaintiff drove from Houston to Defendant's Interstate 29

construction project in Iowa.  (Pl.'s SMF, Dkt. [28-8] ¶¶ 1-2.)  He then reported

for work at Defendant's field office on June 7-8, 2010, and was instructed to do

paperwork and attend orientation.  (Id. ¶¶ 3-4.)  On June 9, he finished his

paperwork, underwent more orientation and training, and then went to the I-29

project site where he says he worked for part of that day.  (Id. ¶¶ 6-7.)

2

After working for Defendant for over ten months, Plaintiff's wife, Shelley Lynn Weaver, underwent knee replacement surgery in Macon, Georgia, on April 26, 2011.  (Def.'s SMF, Dkt. [22-1] ¶ 2.)  Ms. Weaver has an extensive history of medical issues, including thyroid cancer, depression, heart attacks, cataracts, and chronic osteoarthritis.  (Weaver Decl., Dkt. [30] ¶¶ 5-12.)  Her osteoarthritis became so severe that by 2010 the bones in her left knee were rubbing against each other.  (Id. ¶ 15.)  Furthermore, her osteoarthritis has prevented her from safely driving a vehicle since 2010.  (Id. ¶ 16.)

Following her April 26 knee replacement surgery, Ms. Weaver suffered from an infection and other complications and was not discharged from the hospital until May 7.  (Id. ¶ 19.)  She was also unable to walk and had to rely on Plaintiff to take care of her.  (Id. ¶ 20.)  Due to continuing complications from the infection, Ms. Weaver underwent a second operation on her knee on June 3 and then a third on June 7.  (Id. ¶¶ 21-22.)  Plaintiff states that he made at least two pre-eligibility requests for future leave under the FMLA on June 2 and June 3.  (Pl.'s SMF, Dkt. [28-8] ¶ 10.)  In addition, he states that he submitted a request on June 8 to take FMLA leave on June 9 and 10 so he could care for his wife in Macon after her release from the hospital.  (Young Decl., Dkt. [29] ¶

3

33.)  On June 9, Plaintiff says that his supervisor, Jim Patterson, contacted him to ask how his wife was doing, and Plaintiff notified Mr. Patterson that the doctor had instructed them to remain in Macon for his wife's further treatment. (Id. ¶ 34.)  Plaintiff told Mr. Patterson that he would need to take a few more days off.  (Id.)  Plaintiff says he was left with the impression that he was on unpaid FMLA leave on June 9 and 10 because he had discussed his wife's surgeries with several supervisors and had requested leave on June 8.  (Id. ¶ 35.) Even so, Plaintiff asserts that a supervisor called on June 10 to inform him that he was being terminated for not reporting to work on June 9.  (Id.)

Defendant maintains that it terminated Plaintiff solely due to his poor work performance.  (Def.'s SMF, Dkt. [22-1] ¶ 18.)  According to Defendant, Plaintiff had several performance issues, such as refusing to perform work asked of him, sitting in his truck and not working for hours, and sleeping on the clock, among others.  (Id. ¶¶ 3-9.)  Plaintiff disputes that he violated any company policies and states that he performed all work required of him.  (Pl.'s Resp. to Def.'s SMF, Dkt. [31] ¶¶ 3-9.)  For example, he says that he sometimes worked from his truck on a laptop while at job sites and only slept in his truck with permission from his foreman while he was on-call.  (Id. ¶¶ 5-6.)

4

Defendant states that Mr. Patterson met with Plaintiff on May 16, 2011, to address these performance issues.[1]  (Patterson Aff., Dkt. [22-3] ¶ 12.)  On May 18, Mr. Patterson drafted a letter summarizing their meeting about these issues, which Plaintiff signed.  (May 18 Letter, Dkt. [22-3] at 5-6.)  According to Plaintiff, all they discussed on May 16 was his wife's health and an increase in his truck allowance, and he was only asked to sign the letter to acknowledge receiving it.  (Young Decl., Dkt. [29] ¶ 27.)  Plaintiff denies that any meeting took place to address his performance, and he further denies being notified that he could be terminated for continuing certain conduct.  (Pl.'s Resp. to Def.'s SMF, Dkt. [31] ¶ 10.)  Defendant, on the other hand, contends that Plaintiff developed a combative and uncooperative attitude and continued to violate company policy after the May 16 meeting.  (Def.'s SMF, Dkt. [22-1] ¶ 11.)  On June 21, 2011, Defendant sent Plaintiff a letter articulating its reasons for terminating him, which ranged from his refusals to perform work asked of him

---

[1]There is some inconsistency in the record as to whether the meeting took place on May 16 or May 18.  Defendant's Statement of Material Facts states that Plaintiff and Mr. Patterson met on May 18.  (Dkt. [22-1] ¶ 10.)  However, the May 18 date in Mr. Patterson's Affidavit was crossed out and corrected to May 16.  (Dkt. [22-3] ¶ 12.)  Moreover, Defendant's briefs refer to a May 16 meeting.  (E.g., Def.'s Br., Dkt. [22-2] at 2.)  Thus, the Court infers that the reference to a May 18 meeting was a scrivener's error and that the parties' versions of events are as summarized herein.

to his failure to submit equipment repair reports.  (Termination Letter, Dkt. [22-3] at 7-8.)

Plaintiff disputes this justification, insisting that he never received any criticism of his work performance until after he put Mr. Patterson and other supervisors on notice of Ms. Weaver's health complications and his intention to take future FMLA leave.  (Young Decl., Dkt. [29] ¶ 38.)  According to Plaintiff, Defendant's justifications are pretext for its real motivation to avoid granting Plaintiff FMLA leave.  (Pl.'s Resp., Dkt. [28-1] at 23.)  Moreover, Plaintiff contends that Defendant's actions constituted discrimination and retaliation under the ADA and Rehabilitation Act.  Plaintiff also reasons that Defendant terminated him to avoid providing costly health insurance benefits for Ms. Weaver, pointing out that one week after his termination, Defendant announced that it was switching from a self-insured employee healthcare program to a fully insured healthcare program.  (Pl.'s SMF, Dkt. [28-8] ¶ 18.)  Finally, Plaintiff argues that Defendant did not compensate him for all the hours he worked on May 14 and 15, 2011.  (Pl.'s Resp., Dkt. [28-1] at 34.)

Accordingly, Plaintiff sets forth the following claims in his Amended Complaint [3]: disability discrimination and retaliation in violation of the ADA

6

(Count I), intentional infliction of emotional distress (Count II), failure to pay wages in violation of the FLSA (Count III), breach of contract (Count IV), violations of the FMLA (Count V), and violations of the Rehabilitation Act (Count VI).  Defendant moves for summary judgment on all claims.

## Discussion

As a preliminary matter, Plaintiff's Motion for Leave to File Responsive Materials out of Time [32] is **GRANTED**.  Furthermore, Plaintiff notes in his Response [28-1] that he wishes to withdraw his intentional infliction of emotional distress and breach of contract claims because he believes they are no longer viable.  (Dkt. [28-1] at 2 n.1.)  Accordingly, Counts II and IV are hereby **DISMISSED**.

## I.      Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational

8

trier of fact to find for the non-moving party, there is no genuine issue for trial."

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(a), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

## II.    ADA Claims

### A.    Discrimination

Plaintiff first argues that Defendant discriminated against him because his

wife suffers from a disability.  Because Plaintiff himself does not suffer from a

disability, he seeks to recover under the ADA's "association provision," which

prohibits discrimination against "a qualified individual because of the known

disability of an individual with whom the qualified individual is known to have

a relationship or association."  42 U.S.C. § 12112(b)(4).

To analyze ADA claims, courts employ the burden-shifting framework

set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See

<u>Wascura v. City of South Miami</u>, 257 F.3d 1238, 1242 (11th Cir. 2001).  Thus, to establish a prima facie case of "association discrimination," Plaintiff must establish the following elements: "(1) [he] was subjected to an adverse employment action, (2) [he] was qualified for the job at that time, (3) [he] was known by [Defendant] at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [Defendant's] decision." <u>Hilburn v. Murata Elecs. N. Am., Inc.,</u> 181 F.3d 1220, 1230-31 (11th Cir. 1999). "[I]f the plaintiff successfully demonstrates a prima facie case, the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason." <u>Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,</u> 446 F.3d 1160, 1162 (11th Cir. 2006). If the employer meets this burden, then the burden of production shifts back to the plaintiff, who "must show that the proffered reason really is a pretext for unlawful discrimination." <u>Id.</u> (quoting <u>EEOC v. Joe's Stone Crab, Inc.,</u> 296 F.3d 1265, 1272 (11th Cir. 2002)).

### 1.   Is Ms. Weaver Disabled under the ADA?

The parties do not dispute that Plaintiff suffered an adverse employment

action, that he was qualified for the job, and that the circumstances raise a reasonable inference that Ms. Weaver's disability was a determining factor in Defendant's decision.  The only element Defendant contests of Plaintiff's prima facie case is whether Ms. Weaver had a disability as defined in the ADA.[2] (Def.'s Br., Dkt. [22-2] at 7-8.)

The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  Id. § 12102(2)(A).  To ensure expansive coverage under the ADA, Congress enacted the ADA Amendments Act of 2008 ("ADAAA") to overturn Supreme Court decisions that "created an inappropriately high level of limitation necessary to obtain

---

[2]Defendant raises in its Reply [34], for the first time, that Plaintiff's supervisors only knew that Ms. Weaver was having knee surgery but did not know of her preexisting conditions.  (Dkt. [34] at 3-4.)  But because Defendant did not raise this issue when it moved for summary judgment, the Court need not consider this argument.

coverage under the ADA."[3]  Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified as amended in scattered sections of 42 U.S.C.).  The ADAAA therefore "reinstat[ed] a broad scope of protection to be available under the ADA."  Id. (codified at 42 U.S.C. § 12102(4)(A)).  Accordingly, the definition of "disability" must be construed "to the maximum extent permitted by the terms of [the ADA]."  Id.  The term "substantially limits" must also be construed broadly.  42 U.S.C. § 12102(4)(B).

Plaintiff argues that Ms. Weaver is disabled under the first prong of the disability definition, i.e. that she is actually disabled due to an impairment that substantially limits one or more major life activities.  In interpreting these provisions of the ADA, "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") for guidance."  Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 911 (11th Cir. 1996)

---

[3]Specifically, Congress rejected the Supreme Court's requirement in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), that courts take into account the corrective effects of mitigating measures when considering whether an impairment substantially limits a major life activity.  Id. at 482-83.  Congress also rejected the holding of Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002), which required that the terms "substantially" and "major" "be interpreted strictly to create a demanding standard for qualifying as disabled" such that "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Id. at 197-98.

(citing 42 U.S.C. § 12116).  According to the EEOC, a physical impairment is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."  Id. § 1630.2(j)(1)(ii).  The EEOC also makes clear that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  Id. § 1630.2(j)(1)(iii).

Defendant argues that Ms. Weaver was not disabled because "there is nothing permanent about a knee infection or the surgery.  These were temporary conditions that were being treated."  (Def.'s Br., Dkt. [22-2] at 8.)  The ADAAA, however, has dispensed with the requirement that courts consider the duration of an impairment when weighing whether it substantially limits a

13

major life activity.[4]  Under the ADAAA regulations, "effects of an impairment

lasting or expected to last fewer than six months can be substantially limiting

within the meaning of this section."[5]  29 C.F.R. § 1630.2(j)(1)(ix).

Consequently, the fact that an impairment might only last a few months is not

dispositive.

     Plaintiff's evidence demonstrates that by 2010, Ms. Weaver's

osteoarthritis was so severe that she was unable to drive.  (Weaver Decl., Dkt.

[30] ¶¶ 15-16, 20.)  After she had her knee replaced on April 27, 2011, she was

unable to walk and needed her husband to care for all of her needs.  (Id. ¶ 20.)

Even assuming that having a knee replacement is a temporary impairment, as

Defendant suggests, she is still considered disabled under the ADAAA because

her impairment significantly limited major life activities while she recovered,

---

[4]According to Defendant, the following factors are relevant: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  Gordon, 100 F.3d at 911 (citing 29 C.F.R. § 1630.2(j)(2)).  Gordon, however, was decided in 1996 and cited regulations no longer in force.

[5]For the "regarded as" prong of the definition of disability, there is an exception for "transitory and minor impairments," with "transitory" defined as "lasting or expected to last six months or less."  29 C.F.R. § 1630.15(f).  However, this exception expressly does not apply to the "actual disability" prong or the "record of disability" prong.  Id. § 1630.2(j)(1)(ix).

14

such as walking, bathing, or lifting more than twenty-five pounds.  (Id. ¶¶ 33-40.)  Ms. Weaver's June 3 and June 7 operations only added to the expected duration of her recovery.  Defendant has presented no evidence disputing these facts.  Accordingly, the Court readily concludes that Ms. Weaver was disabled under the ADA at the time Plaintiff was terminated.  Consequently, Plaintiff has stated a prima facie case of association discrimination, and the burden shifts to Defendant to proffer a legitimate, non-discriminatory reason for the adverse employment action against Plaintiff.

### 2. Has Defendant Proffered a Legitimate Reason for Terminating Plaintiff?

Once a plaintiff has established a prima facie case, a defendant need only raise a genuine issue of fact as to whether the employer discriminated against its employee.  Wascura, 257 F.3d at 1241.  The defendant at this stage need not prove that he or she actually was motivated by the proffered nondiscriminatory reasons; on the contrary, the defendant need only raise sufficient evidence from which a reasonable trier of fact could conclude that the employer's decision was not motivated by discriminatory animus.  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

15

Here, Defendant has produced evidence that it terminated Plaintiff because he "continued his practices of violating company policy and further adopted a combative and uncooperative attitude" after he was warned to correct his performance deficiencies.  (Def.'s SMF, Dkt. [22-1] ¶ 10; <u>see</u> Patterson Aff., Dkt. [22-3]; Thompson Aff., Dkt. [22-4].)  Specifically, Plaintiff's documented performance issues prior to his termination were (1) his refusal to perform work asked of him, (2) sitting in his truck and not working while on the clock, (3) sleeping in his truck, (4) failing to observe and correct visible maintenance issues, (5) failing to submit time sheets on time, (6) failing to complete and submit equipment repair reports, and (7) submitting false or incorrect time records for work he performed.  (May 18 Letter, Dkt. [22-3] at 5-6.)  Defendant later reiterated these issues in a termination letter it sent to Plaintiff on June 21, 2011.  (Termination Letter, Dkt. [22-3] at 7-8.)

In view of the above documented performance issues, Defendant has offered evidence of legitimate, non-discriminatory reasons for its decision. Therefore, to avoid summary judgment, Plaintiff must produce "sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual."  <u>Wascura</u>, 257 F.3d at 1243.

16

### 3.      Are Defendant's Proffered Reasons Pretextual?

To establish pretext, a plaintiff must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Martin v. Brevard Cnty. Pub. Schs., 543 F.3d 1261, 1268 (11th Cir. 2008). Plaintiff disputes each of Defendant's proffered reasons either by providing a justification for his actions or by denying Defendant's account of his behavior. Upon a careful review of the record, and construing all factual inferences in favor of Plaintiff, the Court concludes that Plaintiff has offered sufficient evidence showing that Defendant's proffered explanation that Plaintiff was a poor employee is pretextual.  In its Reply [34], Defendant argues that Plaintiff has failed to present any evidence to support a showing of pretext, noting that all he produced was his own affidavit containing unsupported conclusions. (Dkt. [34] at 9-10.)  Defendant's argument fails for at least three reasons.

First, Plaintiff has in fact produced evidence contesting Defendant's examples of his poor performance.  Although Defendant characterizes Plaintiff's statements as conclusory, Defendant has rebutted Defendant's evidence as best he can given the generality of many of Defendant's grounds

for termination.  For example, Defendant asserts that Plaintiff "had been

observed sitting [in] his truck and not working for hours while on the clock."

(Patterson Aff., Dkt. [22-3] ¶ 7.)  Plaintiff responds that some of his

responsibilities required him to work on a laptop, and so he sometimes worked

from his truck.  (Young Decl., Dkt. [29] ¶ 27.B.)  As general as this statement

is, Defendant was no more specific and did not identify when, where, or how

often he was observed sitting in his truck.  The same can be said for

Defendant's accusations that Plaintiff failed to complete equipment repair

reports or failed to perform work asked of him.  In fact, even though Defendant

does not specify what type of work he failed to perform, Plaintiff states that he

only refused to operate a fuel or lube truck because he did not have the proper

commercial driver's license with a hazardous materials endorsement.  (Id. ¶

28.A.)  And in response to Defendant's general accusation that he frequently

slept on the job, Plaintiff asserts that he had permission to sleep from his

foreman while he was on call.  (Id. ¶ 28.C.)  After Plaintiff's termination, Mr.

Patterson noted, "Since our discussion on May 16th, the same behaviors you

were warned about have continued . . . ."  (Termination Letter, Dkt. [22-3] at 8.)

18

However, Defendant did not identify any particular incidents, the dates these subsequent failures took place, or how often they occurred.

The Court notes that Defendant does offer a few more specific examples of Plaintiff's failures, such as when Mr. Patterson told Plaintiff of one instance when he should have recognized that a piece of equipment needed to be fixed at a job site. (May 18 Letter, Dkt. [22-3] at 5.) Aside from that example, Defendant offers no other evidence that Plaintiff "frequently failed to observe and correct visible maintenance or other equipment issues," and Defendant does not provide examples of any failures to attend to such issues after Plaintiff was warned. (Termination Letter, Dkt. [22-3] at 7.) Thus, considering the general nature of Defendant's evidence, Plaintiff's rebuttal evidence is sufficiently probative to raise a genuine question as to the credibility of Defendant's proffered reasons.

Second, Plaintiff contends that Defendant fired him because he did not report for work on June 9, 2011, a day he says he was entitled to FMLA leave. Defendant dismisses Plaintiff's argument, asserting that it would still be entitled to summary judgment even if the Court accepted Plaintiff's facts because it had cause to fire him after not reporting to work on June 9. (See Def.'s Reply, Dkt.

19

[34] at 9.)  Oddly, Defendant did not even proffer this justification when it moved for summary judgment, and while Defendant need not prove at this stage that it actually was motivated by the proffered nondiscriminatory reasons, see Combs, 106 F.3d at 1528, Plaintiff's assertion that the reason given for his termination at the time is not a reason given now is one factor showing that Defendant later manufactured a justification for its discrimination.

More important, though, is the Court's final reason for finding a jury issue, which is the temporal proximity between the relevant events, which all transpired in the span of over one month.  See, e.g., Hurlbert v. St. Mary's Health Care Sys., 439 F.3d 1286, 1298 (11th Cir. 2006) (describing two weeks between an employee's request for leave and his termination as evidence of pretext); Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("We have held that a period as much as one month between the protected expression and the adverse action is not too protracted.").  Cf. Wascura, 257 F.3d at 1245 (holding that a three and one-half month period between the protected expression and adverse action, without more, was insufficient to establish pretext).  On May 7, 2011, Plaintiff informed his supervisors about Ms. Weaver's health issues and his intention to take leave.  (Young Decl., Dkt. [29]

¶ 38.)  Plaintiff then states that he "was never given notice of having any performance-related issues" until he received the May 18 letter.  (Id.) Moreover, Defendant documented no performance problems prior to May 18. Then, following Ms. Weaver's additional surgeries on June 3 and 7, Plaintiff was fired on June 10, less than one month after his supervisors became aware of Ms. Weaver's condition.  Finally, on June 17 Defendant changed its health insurance from a self-insured program to a fully insured one, over a month after it first learned of the surgery.  In sum, construing all inferences in favor of Plaintiff, the temporal proximity of these events is consistent with his theory that Defendant fired him to avoid providing Ms. Weaver with costly health benefits.

While temporal proximity alone does not establish pretext, here there is other evidence contradicting Defendant that, taken together, raise a reasonable inference that Ms. Weaver's disability was a determining factor in Defendant's decision to terminate Plaintiff.  See Hurlbert, 439 F.3d at 1298 (noting that while a temporal proximity of two weeks alone was probably insufficient to establish pretext, proximity along with other evidence created a genuine issue of material fact).  After considering Plaintiff's evidence in conjunction with his

prima facie case, the Court finds that Plaintiff has established sufficient evidence of pretext to preclude summary judgment on his ADA discrimination claim.

      <u>B.</u>     <u>Retaliation</u>

In addition to its prohibition on discrimination, the ADA prohibits retaliation, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  The same burden-shifting framework that governs claims for ADA discrimination also governs claims for ADA retaliation.  <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1287 (11th Cir. 1997). In that regard, Plaintiff must first establish a prima facie case of retaliation by showing: "(1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action." <u>Id.</u>

Plaintiff claims that Defendant committed three unlawful acts of retaliation against him: (1) Mr. Patterson transferred him to a project in Birmingham less than two weeks after his wife's first surgery on April 26,

2011; (2) Mr. Patterson retaliated against Plaintiff by falsely accusing him of violating company policies in the May 18, 2011 letter; and (3) Mr. Patterson terminated him in retaliation for requesting leave and taking off work to care for his disabled wife.  (Pl.'s Resp., Dkt. [28-1] at 14.)

Defendant first argues that the only alleged retaliatory act at issue is Plaintiff's termination because that is the only basis for retaliation that Plaintiff alleged in his Amended Complaint [3].  Indeed, although he did reference being sent to Birmingham, Plaintiff did not allege that this was done in retaliation for any protected activity.  (See Am. Compl., Dkt. [3] ¶¶ 22-35.)  His allegations about the May 18 letter, on the other hand, are probative in determining whether Defendant had a legitimate, non-discriminatory reason to terminate him.  For this reason, the May 18 letter is relevant to Plaintiff's retaliatory termination claim.

Next, Defendant argues that it is entitled to summary judgment on the retaliation claim for two reasons: (1) Plaintiff's prima facie case fails because Defendant did not even know that Ms. Weaver had a disability, and (2) even if Plaintiff stated a prima facie case, Defendant had legitimate reasons for terminating Plaintiff.  (Def.'s Reply, Dkt. [34] at 4-5.)  However, Defendant did

not argue that it lacked knowledge of Ms. Weaver's disability when it moved

for summary judgment, and so the Court need not weigh this argument.[6]  As for

Defendant's reasons for terminating Plaintiff, the Court has already found that

Plaintiff has produced sufficient evidence of pretext.  Accordingly, there is a

genuine question of material fact as to Plaintiff's ADA retaliation claim based

on his termination.

## III.    Rehabilitation Act Claims

Plaintiff also argues that Defendant violated Section 504 of the

Rehabilitation Act, which prohibits discrimination against a "qualified

individual with a disability" in "any program or activity receiving Federal

financial assistance."[7]  29 U.S.C. § 794(a).  Defendant notes that unlike in the

ADA, there is no association discrimination provision in the Rehabilitation Act

---

[6]See supra n.2.

[7] Defendant argues that it did not receive federal financial assistance because it
only received payments from the federal government as a market participant.  (Def.'s
Br., Dkt. [22-2] at 17.)  See Arline v. School Bd. of Nassau Cnty., 772 F.2d 759, 762
(11th Cir. 1985) (noting in dicta that "when the federal government makes payments
for obligations incurred as a market participant such payments do not constitute
'federal assistance' ").  Nevertheless, Defendant admitted in its Answer to Plaintiff's
Amended Complaint [6] that it received federal financial assistance as interpreted
under the Rehabilitation Act.  (See Dkt. [3] ¶ 71.)  The Rehabilitation Act thus
applies.

itself.  Plaintiff argues that he can maintain an association discrimination claim under the Rehabilitation Act because the "standards used to determine whether [the Rehabilitation Act] has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990."  Id. § 794(d); see also Sutton v. Lader, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999) ("The standard for determining liability under the Rehabilitation Act is the same as that under the ADA.").  Moreover, the Rehabilitation Act permits "any person aggrieved by any act or failure to act by any recipient of Federal assistance" to bring suit.  29 U.S.C. § 794a(a)(2).

Although the Eleventh Circuit appears not to have squarely addressed the issue, other courts have concluded that it is possible for someone associated with a disabled person to raise a claim under the Rehabilitation Act.  See, e.g., Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 279 (2d Cir. 2009) (Wesley, J., concurring)[8] (noting that "non-disabled parties bringing association discrimination claims need only prove an independent injury causally related to the denial of federally required services to the disabled persons with whom the

---

[8]This language appears in a concurring opinion but was written for a majority of the court on this point.  See Loeffler, 582 F.3d at 277 ("The opinion of Judge Wesley constitutes the opinion of the Court as to this issue.").

non-disabled plaintiffs are associated"); <u>MX Grp., Inc. v. City of Covington</u>,

293 F.3d 326, 334-35 (6th Cir. 2002) (describing how the broad enforcement

language of the Rehabilitation Act permits association discrimination claims);

<u>Walthall v. Fulton Cnty. Sch. Dist.</u>, 18 F. Supp. 2d 1378, 1386 (N.D. Ga. 1998)

(applying the same analysis to association discrimination claims under the ADA

and Rehabilitation Act).  Here, Plaintiff was independently harmed because he

asserts that Defendant fired him to avoid the expense of insuring his wife.  He is

therefore a "person aggrieved" within the meaning of Section 794a(a)(2) and

may bring a claim for association discrimination.  Consequently, the Court's

ADA analysis applies to Plaintiff's Rehabilitation Act claim, and thus

Defendant is not entitled to summary judgment on Plaintiff's Rehabilitation Act

claims.

## IV.   FMLA Claims

Plaintiff bases his FMLA claim on Defendant's refusal of his June 8

request for leave and then firing him to avoid having to provide any leave.

(Pl.'s Resp., Dkt. [28-1] at 23.)  Under the FMLA, "an eligible employee shall

be entitled to a total of 12 workweeks of leave during any 12-month period . . .

[i]n order to care for the spouse, or a son, daughter, or parent, of the employee,

26

if such spouse, son, daughter, or parent has a serious health condition." 29

U.S.C. § 2612(a)(1)(C).  An "eligible employee" is defined as an employee who

has been employed "for at least 12 months by the employer with respect to

whom leave is requested" and has worked at least 1,250 hours during the

previous 12-month period.  Id. § 2611(2)(A).  Section 2615(a) of the FMLA

authorizes employees to bring two types of claims: "interference claims, in

which an employee asserts that his employer denied or otherwise interfered

with his substantive rights under the Act; and retaliation claims, in which an

employee asserts that his employer discriminated against him because he

engaged in an activity protected by the Act."  Pereda v. Brookdale Senior

Living Communities, Inc., 666 F.3d 1269, 1272 (11th Cir. 2012).  For both

claims, Defendant advances two primary arguments: (1) Plaintiff was not yet

eligible for FMLA leave when he was terminated; and (2) Defendant terminated

him for legitimate reasons unrelated to his request for FMLA leave.

    A.    Inteference

    "To state a claim for interference with a substantive right, an employee

need only demonstrate by a preponderance of the evidence that he was entitled

to the benefit denied."  Strickland v. Water Works & Sewer Bd., 239 F.3d 1199,

27

1206-07 (11th Cir. 2001).  "He does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant." Id. at 1208. But, if Defendant can show that it terminated him—and thereby denied him FMLA leave—due to his performance issues, then Defendant would not be liable for interference.  See Schaff v. Smithkline Beecham Corp., 602 F.3d 1236, 1241 (11th Cir. 2010) (holding that an employer does not interfere with a right to reinstatement after taking FMLA leave if the termination or demotion is due to "independent performance-related reasons").

     As a threshold matter, Defendant contends that Plaintiff did not raise a claim for FMLA interference until his Response.  (Def.'s Reply, Dkt. [34] at 7.) In his Amended Complaint [3], Plaintiff alleged that "Defendant did not grant Young leave of absence pursuant to the FMLA from June 8, 2011 to June 10, 2011," a substantive right to which Plaintiff believed he was entitled, and that "[b]y refusing to grant Young FMLA leave, Defendant was in direct violation of the FMLA."  (Am. Compl., Dkt. [3] ¶¶ 61-62.)  Plaintiff therefore put Defendant on notice that he was alleging interference because Plaintiff alleged he was denied a right under the Act.

As for the substance of Plaintiff's interference claim, Defendant argues that Plaintiff was not entitled to the benefit denied because he had not yet worked for Defendant for twelve months. Defendant contends that it hired Plaintiff on June 11, 2010, because that is the first day Plaintiff performed any work. As such, Plaintiff was employed for less than twelve months and so was not entitled to FMLA when he requested it on June 8, 2011. (Def.'s Br., Dkt. [22-2] at 14.) Defendant's argument is unavailing for two reasons. First, pre-eligibility requests for post-eligibility leave under the FMLA are protected. As the Eleventh Circuit has held, "the FMLA regulatory scheme must necessarily protect pre-eligible employees such as [Plaintiff], who put their employers on notice of a post-eligibility leave request." Pereda, 666 F.3d at 1275. Thus, "a pre-eligible employee has a cause of action if an employer terminates her in order to avoid having to accommodate that employee with rightful FMLA leave rights once that employee becomes eligible." Id. Here, Plaintiff put his employer on notice on May 7, 2010, that he would need to care for his wife after her knee replacement surgery, gave notice of his intention to take leave on June 2 and 3, and then made a specific request for leave on June 8. Even if Plaintiff would not have become eligible until June 11, 2011, as Defendant

29

argues, then Plaintiff would still have a cause of action because he was exercising his right to request post-eligibility FMLA leave.

Second, Plaintiff has put forth sufficient evidence to create a factual issue as to his hire date and whether he was actually eligible under the FMLA. Plaintiff has produced an e-mail from June 4 offering him employment and asking him to start on the I-29 project in Iowa.  (Offer E-mail, Dkt. [29-1] at 2.) The evidence shows that Plaintiff then traveled to Iowa the following day and spent June 7-9, 2010, filling out paperwork and attending orientation and training.  (Young Decl., Dkt. [29] ¶¶ 8-15.)  Plaintiff traveled to the I-29 project site on June 9 to begin his initial assessment "and spent approximately two (2) hours studying the pavement and assessing various ways to fix it."  (Id. ¶ 15.) He also submitted new-hire paperwork reflecting a hire date of June 9.  (Dkt. [29-1] at 8, 16.)  In addition, Plaintiff has produced an FMLA investigative report that concluded that he had performed work on June 9, 2010, and therefore became FMLA-eligible twelve months later, on June 8, 2011.  (Dkt. [29-5] at 6.)  In light of the significant evidence Plaintiff raises to dispute his hire date, and because pre-eligibility requests for post-eligibility leave are

30

protected, the Court finds a genuine issue of material fact as to whether Defendant interfered with his rights under the FMLA.

Moreover, as discussed <u>supra</u>, there is a factual issue as to whether Defendant's proffered independent, performance-related reasons for termination were pretextual. Further, in the context of Plaintiff's FMLA claims, the temporal-proximity factor carries even more evidentiary weight. Plaintiff specifically requested FMLA leave on June 8, 2011, which he intended to take on June 9 and 10. (Young Decl., Dkt. [29] ¶¶ 33-35.) The fact that Defendant terminated him on June 10, the day it argues he would have become eligible, is evidence that Defendant interfered with Plaintiff's rights under the FMLA.

B.    Retaliation

The standard for a retaliation claim under the FMLA is more stringent than that for interference. "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." <u>Strickland</u>, 239 F.3d at 1207. In that vein, the same <u>McDonnell Douglas</u> burden-shifting framework employed above applies to FMLA retaliation claims. <u>Id.</u>

31

First, to state a prima facie case for retaliation, "an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." Id. (citing Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000)).

Defendant's arguments fare no better in the retaliation context.  As explained above, Plaintiff's pre-eligibility requests for post-eligibility leave are a protected activity under the FMLA.  And again, the Court has found that there is sufficient evidence of pretext to preclude summary judgment, and the close temporal proximity between the protected activity and the adverse employment decision provides even more forceful evidence that Defendant retaliated against Plaintiff for requesting FMLA leave.  Accordingly, Defendant is not entitled to summary judgment on this claim.

## V.      Violations of the FLSA

Pursuant to the FLSA, a covered employee "must be paid an overtime wage of one and one-half times his regular rate for all hours he works in excess of forty hours per week."  Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1298 (11th Cir. 2011) (citing 29 U.S.C. § 207(a)).  "If a covered

employee is not paid the statutory wage, the FLSA creates for that employee a private cause of action against his employer for the recovery of unpaid overtime wages and back pay."  Id. (citing 29 U.S.C. § 216(b)).

Defendant believes that it is entitled to summary judgment on Plaintiff's FLSA claim because Plaintiff has offered no evidence that Defendant failed to compensate him for all hours worked in May 2011.[9]  Plaintiff points to his time cards for May 14 and 15 as evidence that Defendant unlawfully reduced his hours.  (Pl.'s Resp., Dkt. [28-1] at 34; Time Cards, Dkt. [29-3].)  Plaintiff's time card is broken down into how much time a worker spends on various categories of repairs.  On May 14, Plaintiff recorded that he performed work in three respective categories for two, three, and six hours, yet in the "Total Hours" box, he recorded that he worked fourteen hours that day.  (Dkt. [29-3] at 2.)  Mr. Patterson apparently corrected the total by crossing out and writing in the

_____

[9]Plaintiff also asserts in his Response that he was not compensated for travel time, orientation time, and hotel expenses associated with his trip to Iowa after he was hired in June 2010.  (Dkt. [28-1] at 35.)  However, his Amended Complaint [3] provided no notice that he was alleging an FLSA violation on this basis.  Rather, the allegations on the face of the Amended Complaint [3] pertain solely to the dates surrounding Ms. Weaver's knee surgeries in April-June 2011, and make no mention of unpaid compensation for travel or orientation time in June 2010.  Accordingly, the Court does not consider this argument.  See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

33

correct sum to reflect the eleven hours Plaintiff actually accounted for in the repair categories.  Similarly, on May 15 Plaintiff recorded that he worked four hours in two categories each, yet reported that he worked a total of twelve hours.  (Id. at 4.)  This total was crossed out and reduced to eight.  Plaintiff's statement that "Defendant did not fully compensate [him] for all hours worked on May 14, 2011 and May 15, 2011," is insufficient to raise a factual issue as to the hours he accounted for on his time sheets.  (Pl.'s SMF, Dkt. [28-8] ¶ 28.) All a reasonable jury could infer from this evidence is that Mr. Patterson simply corrected the total to reflect Plaintiff's own accounting of his time.  Defendant is entitled to summary judgment on Plaintiff's FLSA claim because Plaintiff has not created any factual issue as to whether he was compensated appropriately.

## Conclusion

For the foregoing reasons, Plaintiff's Motion for Leave to File Responsive Materials out of Time [32] is **GRANTED**, and Defendant's Motion for Summary Judgment [22] is **GRANTED in part** and **DENIED in part**.  It is **GRANTED** as to Counts II, III, and IV.  It is **DENIED** as to Counts I, V, and VI.  The parties shall submit a proposed consolidated pretrial order within thirty (30) days of the entry of this Order.

AO 72A
(Rev.8/82)

**SO ORDERED**, this  24th  day of March, 2014.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE